AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT



LODGED
CLERK, U.S. DISTRICT COURT

04/11/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

for the

Central District of California



FILED
CLERK, U.S. DISTRICT COURT

4/11/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ D.C. _____ DEPUTY

United States of America

v.

JULIAN PULIDO,
  aka "Juls," and
CLIFFORD MICHAEL LAVOY,
  aka "Buckshot,"

         Defendants

Case No. 5:25-mj-00197

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 4, 2025, in the county of San Bernardino in the Central District of California, the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1959(a)(1) | Murder in Aid of Racketeering (for PULIDO) |
| 18 U.S.C. §§ 1959(a)(3), 2(a) | Assault Resulting in Serious Bodily Injury in Aid of Racketeering (for LAVOY) |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Sean P. Spaulding*
_____
*Complainant's signature*

Sean P. Spaulding, ATF Task Force Officer
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    4/11/25

_____
*Judge's signature*

City and state:   Riverside, California

Hon. Shashi H. Kewalramani, U.S. Magistrate Judge
_____
*Printed name and title*

AUSAs: Declan T. Conroy & Daniel H. Weiner

**AFFIDAVIT**

I, Sean P. Spaulding, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.   I am a California Highway Patrol ("CHP") Investigator and Task Force Officer ("TFO") with the Bureau of Alcohol Tobacco, Firearms and Explosives ("ATF") and have been so employed since February 2009.  I am currently assigned to a Violent Gang Task Force at the Los Angeles Field Office of the ATF, which conducts investigations into violent gang activity in the Southern California area, and is a multi-agency federal, state, and local gang task force.  Since August 2018, I have primarily worked on investigations targeting violent outlaw motorcycle gangs.  The criminal activities I have investigated involving these gangs include racketeering offenses in violation of 18 U.S.C. §§ 1959 and 1962, controlled substances offenses in violation of 21 U.S.C. §§ 841(a)(1) and 846; and firearms offenses in violation of 18 U.S.C. §§ 922(g) and 924(c).

2.   I completed the POST certified California Highway Patrol Academy where I received over 1,200 hours of training in August 2009.  I have completed numerous trainings and attended several intelligence meetings and seminars facilitated by experts of various subject matters.  These include search and seizure, 80-hour core investigations course, 24-hour gang expert course, 40-hour advanced gang investigation course, courses specific to outlaw motorcycle gangs, narcotics trafficking and packaging, firearms investigations, crime scene preservation and federal hate crimes.  I have conducted numerous debriefs and

1

interviews with members of criminal street gangs including outlaw motorcycle gangs. I have worked with expert gang investigators on large scale federal cases. Additionally, I have done open-source research into outlaw motorcycle gangs and various criminal street gangs.

3. My experience as a TFO with the ATF includes, but is not limited to, conducting physical surveillance, interviewing witnesses and subjects, executing search and arrest warrants, and operating informants. I have received training in, and have experience in, the investigation of violations of federal law, including violations of federal drug conspiracy laws and racketeering offenses. I have participated in several gang investigations involving the organized distribution of illegal drugs and firearms. I have participated in multiple arrests for drug, gun, and violence related offenses. I have participated in the execution of search warrants, which have resulted in the seizure of illegal drugs, guns and other evidence of federal and state criminal violations. I have also supervised and assisted in the supervision of the activities of informants who have provided information, and other assistance resulting in federal and state prosecution of drug, gun, and racketeering offenders. I have become familiar with the methods, language, structures, and criminal activities of street gangs and transnational gangs, including outlaw motorcycle gangs, operating within and outside of this judicial district.

## II. **PURPOSE OF AFFIDAVIT**

4.    This affidavit is made in support of a criminal complaint against, and arrest warrants for Julian PULIDO, also known as ("aka") "Juls" ("PULIDO") and Clifford Michael LAVOY, aka "Buckshot" ("LAVOY") (collectively, the "defendants") for violations of 18 U.S.C. § 1959(a)(1) (Murder in Aid of Racketeering) (for PULIDO), and 18 U.S.C. § 1959(a)(3) (Assault Resulting in Serious Bodily Injury in Aid of Racketeering) and 18 U.S.C. § 2(a) (Aiding and Abetting) (for LAVOY) (collectively, the "Charged Offenses").[1]

---

[1] The following description of the law was provided by the U.S. Attorney's Office for the Central District of California:

Violent Crimes in Aid of Racketeering Activity ("VICAR"), in violation of 18 U.S.C. § 1959(a), in this case, has the following elements:

(1)    Beginning at a time unknown and continuing until, at least, March 4, 2025, an enterprise affecting interstate commerce existed;

(2)    The enterprise engaged in racketeering activity;

(3)    The defendant committed the following crime of violence:

(i) murder, as defined in California Penal Code ("CA PC") §§ 187(a), 189 and 190 (for PULIDO); and

(ii) aiding and abetting assault with force likely to produce great bodily injury, in violation of CA PC §§ 31 and 245(a)(4) (for LAVOY); and

(4)    That the defendant's purpose in committing the crime was to gain entrance to, maintain, or increase his position in the enterprise.

Murder in violation of CA PC §§ 187(a), 189 and 190 has the following elements:

(1)    The defendant committed an act that caused the death of another person;

(2)    When the defendant acted, he had a state of mind called malice aforethought;

(3)    The defendant acted willfully, deliberately, and with premeditation; and

*(footnote cont'd on next page)*

5.    This affidavit is also made in support of an application for a warrant to search the following:

a.    The premises located at 10562 Oak Glen Avenue in Montclair, California, specifically the detached residence in the southwest corner of the property, believed to be the residence of LAVOY, as described more fully in Attachment A (the "SUBJECT PREMISES").

6.    The requested warrant to search the SUBJECT PREMISES described in Attachment A seeks authorization to seize evidence,

---

(4)    The defendant killed without lawful excuse or justification.

Assault with force likely to produce great bodily injury in violation of CA PC § 245(a)(4) has the following elements:

(1)    The defendant did an act that by its nature would directly and probably result in the application of force to a person;

(2)    The force used was likely to produce great bodily injury;

(3)    The defendant did that act willfully;

(4)    When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and

(5)    When the defendant acted, he had the present ability to apply force likely to produce great bodily injury to a person.

To be guilty of assault with force likely to produce great bodily injury under an aiding and abetting theory under CA PC § 31, the following must be true:

(1)    The perpetrator committed the crime of assault with force likely to produce great bodily injury;

(2)    The defendant knew that the perpetrator intended to commit the crime;

(3)    Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and

(4)    The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

fruits, or instrumentalities of violations of 18 U.S.C. § 1959
(Violent Crime in Aid of Racketeering) and 18 U.S.C. § 1962(d)
(Racketeering Conspiracy) (the "Subject Offenses"), committed by
LAVOY, and others known and unknown, as described more fully in
Attachment B.  Attachments A and B are incorporated herein by
reference.

7.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested arrest and search
warrants and complaint, and does not purport to set forth all of
my knowledge of or investigation into this matter.  Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    In the early-morning hours of March 4, 2025, two
members of the Mongols Motorcycle Club, Julian PULIDO, also
known as ("aka") "Juls" ("PULIDO") and Clifford Michael LAVOY,
aka "Buckshot" ("LAVOY"), violently attacked a member of the
Vagos Motorcycle Club at a bar in Ontario, California, before
PULIDO shot and killed the victim as the victim attempted to run
out of the bar.  PULIDO and LAVOY initially confronted the
victim, V.S. -- who was wearing clothing reflecting his
membership in the Vagos, a rival motorcycle gang -- inside the
bar, and told V.S. that V.S. needed to show respect to PULIDO

5

and LAVOY as members of a rival gang.  Later, PULIDO and LAVOY
assaulted and overpowered V.S., including by punching V.S. in
the face, choking V.S., and causing multiple injuries to V.S.'s
face, head, and neck.  When V.S. then tried to run out of the
bar, PULIDO pulled out a gun and shot V.S. multiple times in the
back, causing V.S. to fall through the door of the bar and bleed
out on the sidewalk.

9.    For the reasons described below, I believe that the
two defendants attacked V.S., and that PULIDO killed V.S., for
purposes of maintaining, increasing, and enhancing position
within the Mongols Motorcycle Club, an enterprise engaged in
racketeering activity.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    Background on Mongols Motorcycle Club, the Enterprise[2]**

10.    The Mongols Motorcycle Club (the "Mongols" or the
"Enterprise") is a nationwide and transnational criminal
organization that identifies itself as an "outlaw" motorcycle
gang.  Mongol members identify themselves with patches, tattoos,
and insignia identifying their connection to the gang, and their
status within the organization.  Specifically, Mongols will

---

[2]    The background information on the Mongols contained in
Section IV.A is based on my training and experience, my review
of indictments returned by federal grand juries against the
Mongols, communication with other law enforcement officers, as
well as interviews that I and/or other law enforcement officers
have had with witnesses, cooperating defendants, informants, and
suspects.

I am aware of multiple federal prosecutions against the
Mongols and their members/associates, including <u>United States v.
Cavazos, et al.</u>, Case No. CR 08-1201-DOC (C.D. Cal.), <u>United
States v. Mongol Nation</u>, Case No. CR 13-106-DOC (C.D. Cal.), and
<u>United States v. Frazier, et al.</u>, Case No. CR 17-130 (M.D.
Tenn.).

frequently wear leather vests with the "patched" image of a Mongol motorcycle rider (a bald, scowling man with sunglasses and a ponytail) and the name of the member's regional "chapter" sewn on the vests.  Below is an example of a Mongols patch, with a picture of the Mongols rider surrounded by the text "Mongols California."



11.  Mongols "officers" will frequently wear patches that indicate that they are officers in the Enterprise. Additionally, the "Mother Chapter" members[3] will reward members who have distinguished themselves within the organization by presenting them with specific patches or authorizing them to bear a Mongols "full-patch" tattoo.  The Mongols Mother Chapter may award a specific Mongols member a "skull and crossbones" or "Respect Few Fear None" patch to those members who have committed murder or engaged in acts of violence on behalf of the Mongols.

//

//

---

[3] As described below, "Mother Chapter" members are the national officers for the Enterprise.

12.  Mongols associate with, and frequently display, the designation of "1%," which is a statement used to distinguish Mongols members from the "99%" of other motorcycle club members who are legitimate and law-abiding.  Mongols define themselves as within the "1%" who are not legitimate and do not adhere to the law or the rights of others.  Members may also wear insignia bearing "MFFM" (an acronym for "Mongols Forever Forever Mongols") or "LMDM" (an acronym for "Live Mongol, Die Mongol"). Below is an example of a Mongols patch with the mottos "1%er" and "MFFM," surrounded by human skull pendants.



13.  The gang has approximately 2,500 members, with approximately 1,000 of those members living in Southern California.  Members of the Mongols include current or former members of other street gangs operating in Los Angeles County, including the Avenues, 18th Street, San Gabriel Valley, South Side Montebello, Lott Stoner, Maravilla, and Varrio Nuevo street gangs.  The Enterprise is comprised of over 175 "chapters," which are located throughout the United States, Mexico, Canada, Europe, and Asia.

14.  The leadership and governing body of the Mongols is its "Mother Chapter."  The Mother Chapter exercises authority over the actions of individual Mongols members and the regional chapters.  Mongols pay money into the Mother Chapter in the form of fees, dues, and "taxes."  Those funds are used, in part, to fund and promote the organization and pay for the legal expenses of Mongols members when they are criminally charged for committing crimes on behalf of the Enterprise.  The Mother Chapter collects and reviews all membership applications and fees for membership, resolves disputes within the organization, and issues incentives, such as tattoos and Mongols patches that honor Mongols members for committing acts of violence on behalf of the Mongols, incurring physical injury on behalf of the Mongols, or performing specific sexual acts at Mongols events.

15.  The Mother Chapter is comprised of the Mongols "national officers."  Chapter officers may be invited to present issues to the Mother Chapter for decision.  However, chapter officers are not permitted to share in the deliberations of the

10

Mother Chapter, and the Mother Chapter's decisions are binding on the regional chapters.  Lower-ranking members and prospective Mongols members frequently are required to patrol and provide armed security against the presence of law enforcement and rival gang members for the Mother Chapter when the Mother Chapter meets.  Those present at Mother Chapter meetings are heavily armed, and the Mother Chapter maintains an arsenal of weapons -- including assault rifles, shotgun and semi-automatic handguns, as well as bullet-proof vests and knives -- at the Mother Chapter residence in downtown Los Angeles, California.

16.  The Mongols maintain an established structure and leadership.  The Mongols maintain a written "constitution" and "by-laws" of the organization, which set forth the rules of membership and a code of conduct for the organization, as well as penalties for non-compliance with the rules of the organization.

17.  Below the national leadership and Mother Chapter, regional Mongols chapters are directed by chapter officers. These officers include the chapter's "president," "vice-president," "secretary/treasurer," and its "sergeant-at-arms," who is required to maintain the weapons and firearms for the chapter.  The sergeant-at-arms may also be required to maintain records of membership applications, and oversee the evaluation of prospective members by private investigators.

18.  Mongols crimes typically include acts of violence -- ranging from battery to murder -- as well as drug-trafficking, money laundering, weapons-trafficking, extortion, and hate

crimes directed against African-Americans who might come into contact with the Mongols.[4]  Members also frequently conduct robberies, steal motorcycles, and engage in the theft of credit card account information to obtain funds for themselves and the organization.  Members often commit their crimes and acts of violence with the conviction that they cannot be prosecuted because they believe victims and witnesses are afraid to testify against them or to cooperate with law enforcement for fear of retaliation by the larger Enterprise.  Mongols frequently use the reputation of the criminal enterprise, especially its history of large-scale violence and riots, as a means to threaten and intimidate the victims and witnesses to their crimes and to protect Mongols from prosecution by local law enforcement.

19.  The Enterprise is actively engaged in drug trafficking, especially the distribution of methamphetamine and cocaine.  Mongols members commonly use methamphetamine and cocaine at Mongols events.  More than this, however, Mongols members and leaders frequently engage in the distribution of drugs, especially methamphetamine and cocaine, as a source of income, both within the organization and to outside customers and associates.  Proceeds from drug trafficking are then owed to the Mongols leadership and the Mother Chapter and collected in the form of "dues" and membership fees.  Large-scale drug traffickers within the organization are often "taxed" at a higher rate within the organization, and their membership in and

---

[4] The Mongols exclude African-Americans, as well as women, from their membership.

payments to the larger Mongols organization are used as a means
to protect them from the same types of penalties and "taxes"
that would ordinarily be claimed by rival street gangs and
Mexican Mafia representatives in the areas controlled by those
rival gangs.  Mongols members are also authorized to call on
other Mongols and Mongols leadership to enforce the collection
of proceeds owed from their drug customers.

20.  Mongols members enforce the authority of the Mongols
by directing attacks against rival motorcycle gangs, such as the
Hells Angels, the Vagos, the Outlaws, and the Sons of Silence,
as well as members of the general public who might defy or
unwittingly come into contact with the Mongols in a way that
might be deemed "disrespectful" to the organization.  Persons in
conflict with, or who might be perceived to have shown
disrespect to, Mongols may be beaten severely or even killed by
being kicked repeatedly with steel-toed boots, stabbed, or shot.
The organization also directs attacks against law enforcement
officers and witnesses who would be willing to cooperate with
law enforcement for the prosecution of the crimes committed by
members of the Mongols, and the organization frequently pays for
the legal representation of members who commit crimes, such as
assaults and murders, on behalf of the Mongols.  The Mongols are
ordinarily vigilant to the presence or arrival of rival gang
members, and will frequently travel to areas claimed by rival
gangs in order to agitate and provoke a confrontation with them.
Mongols are likely to identify such persons and threaten to beat
or kill them if they do not surrender indicia (such as red and

white colored t-shirts, patches, jackets, or sports jerseys bearing the number "81") identifying support for a rival gang. The Mongols organization is also racist and hostile to the presence of African-Americans in bars or clubs where Mongols are present, or African-Americans in the presence of females associated with the Mongols or Mongols members.

21. Mongols frequently refer to one another as "brothers," and to the organization as a "brotherhood." Leaders of the Mongols gang recruit and initiate new members into the Enterprise through a structured application, vetting, and probationary process that is directed through the Mother Chapter. Potential members must be sponsored by existing members and demonstrate their obedience and loyalty to the Mongols organization. Potential members are then required to complete a written application, which is reviewed and cross-checked by private investigators, and they may be subject to a polygraph examination by the Mongols if they are suspected to be a member of law enforcement or an informant to law enforcement. The focus of the investigation conducted before an individual may become a member of the Mongols is to establish the potential member's willingness to commit crimes on behalf of the organization and to preclude the membership of individuals with any connection to law enforcement or who might expose the crimes of the organization to law enforcement.

22. Once a potential member has passed the process, the potential member may be accepted as a prospective member, or "Prospect." The prospective member is given a vest and patches,

which identify him as a Mongols "Prospect."  The Prospect is then assigned to perform duties for the Mongols members, including providing armed security, storing weapons and drugs, and transporting Mongols leaders, for a probationary period. The membership applications and decisions are maintained, reviewed, and determined by the Mother Chapter.

23.    The Mongols maintain a ready supply of firearms -- including handguns, shotguns, automatic assault rifles, and machineguns -- in order to enforce the authority of the gang. These firearms are often stolen or unregistered so that their use cannot be readily connected to the gang member who either used or maintained them.  Weapons often are discarded or destroyed after an incident.  Therefore, gang leaders frequently need to maintain a source of supply for additional unregistered or non-traceable firearms.

24.  The Mongols leadership controls the activities of its members and enforces its authority and internal discipline by killing, attempting to kill, conspiring to kill, assaulting, and threatening its own members or others who would present a threat to the Enterprise or its leadership.  A member who is "out bad" (i.e., in bad standing) with the Enterprise may be required to forfeit his property, especially his motorcycle, and is subject to attack by active Mongols members.

**B.    The Mongols Recent, Violent Rivalry with the Vagos Motorcycle Club[5]**

25.    Over the past four years, at least three violent incidents have occurred in the Central District of California between the Mongols and the Vagos Motorcycle Club (the "Vagos"), cultivating and intensifying a rivalry between the two outlaw motorcycle gangs.

a.    First, on December 19, 2021, Riverside Police Officers responded to a shooting at a Hooters restaurant, where members and/or associates of the Vagos were holding a memorial event for a deceased Vagos member.  During the Vagos memorial, Mongols members and/or associates arrived at the Hooters and a fight between the Mongols and Vagos members broke out, with individuals from both gangs firing shots at each other.  No shooting victims have been identified, but law enforcement found blood at the scene consistent with gunshot wounds.  The individuals suspected of being involved in the shooting fled the scene before officers arrived.

b.    After the December 2021 shooting, attempts were made at the upper levels of the two gangs to broker a meeting between the respective gangs' leadership to resolve the dispute and ease tensions.  However, I understand that these efforts failed, and that the respective leaders of the two gangs never met to resolve the issue.

---

[5] Unless otherwise noted, the facts set forth in Section IV.B are based on my review of law enforcement reports regarding the below-described incidents (including witness statements contained therein), as well as my conversations with other law enforcement officers involved in those investigations.

c.    Then, on May 8, 2024, Los Angeles Police Department ("LAPD") officers responded to a shooting at The Escondite bar in downtown Los Angeles.  That evening, members and/or associates of the Mongols and the Vagos were at the bar for a party hosted by a Mongol "support club"[6] called the Asylum Motorcycle Club.  Outside of the bar, a man later identified as a Vagos member was caught manipulating a motorcycle belonging to a Mongols member and was instructed to stop and leave.  Shortly thereafter, a physical fight broke out between two Vagos members and a group of Mongols.  As the evening progressed and tensions rose, another fight broke out between the two gangs, resulting in two Vagos members shooting at a member of the Mongols.  These shots missed and struck two bystanders not affiliated with either gang.

d.    Shortly after the Escondite shooting, LAPD officers responded to another shooting at a Harley Davidson store in Marina Del Rey, California that occurred between the two gangs on July 21, 2024.  Earlier that afternoon, multiple members and/or associates of the Vagos were gathered at the store with their motorcycles when a group of Mongols members and/or associates arrived and parked across the street.  A fight broke out in the middle of the street between a Vagos and a Mongol, resulting in multiple individuals from the Vagos side of the street confronting the Mongols and provoking a larger

---

[6] A "support club" is a group of individuals who provide support or assistance to an established outlaw motorcycle club, like the Mongols or Vagos.  Members of support clubs may travel with outlaw clubs to, among other things, provide protection or assist in carrying out violent acts on behalf of the outlaw club.

17

altercation.  A Vagos member then pulled out a gun and shot multiple rounds at Mongols members.

      e.   I understand that Mongols and Vagos chapters across the country communicated to their members that the Escondite and Harley Davidson shootings had taken place.  I further understand that regional chapters of both the Mongols and the Vagos told members across the country to anticipate and be prepared for further violence between the two gangs.

### C.   Defendants Are Members of the Mongols[7]

26.  I understand that PULIDO is a "fully patched" member of the Mongols based on the following facts:

      a.   On the night of the below-described murder, PULIDO wore a black hooded sweatshirt with white lettering on the front with the Mongols motto "MFFM," a white Mongols logo on the back (i.e., a picture of the head of the Mongols bike rider), and a black baseball hat with the white letters "Mongols M.C." embroidered on the front.  These Mongols-branded items were found in PULIDO's car when officers arrested him the day after the murder.

      b.   Among other items in PULIDO's car, officers also found a ring bearing the Mongol motto "LMDM," a Mongols-branded beer mug, and a black leather vest with patches on the front bearing Mongols-related insignia, including those stating

---

[7] Unless otherwise noted, the facts set forth in Sections IV.C-G are based on my review of law enforcement reports regarding the investigation of the attack on, and murder of, victim V.S. by the Ontario Police Department ("OPD"), reports and returns of search warrants executed by OPD during the investigation, witness interviews, and my conversations with OPD officers involved in that investigation.

"Mongols California Montclair Charter Member" and "100% Mongol."
The vest also had a patch with a human skull surrounded by the
Mongol motto "Respect Few, Fear None," which I understand is a
patch awarded to those Mongols members who have committed murder
or engaged in acts of violence on behalf of the Mongols.  The
back of the vest has a large Mongols logo patch with the words
"Mongols California."  A picture of the front of PULIDO's vest
is below.



      c.   Law enforcement also executed a search warrant at
PULIDO's residence following the murder, where they found
multiple Mongol-branded items, including a Mongols T-Shirt, a
glass mug, hats, and a picture frame.

       d.   Based on my training and experience, I understand that many of these items -- and in particular the black vest with Mongols patches -- would only be possessed by a fully-patched member of the Mongols.

27.  I likewise understand that LAVOY is a "fully patched" member of the Mongols based on the following facts:

       a.   When LAVOY was arrested on March 6, 2025, he was wearing a black shirt with the Mongols logo, identifying the San Dimas chapter.  He also had a Mongols-branded belt buckle and a ring bearing the Mongols logo surrounded by the phrase "Respect Few, Fear None."

//

//

b.    LAVOY also has multiple Mongols tattoos on his
body, including the Mongols logo with the text "Mongols
California," a picture of a human skull surrounded by the Mongol
motto "LMDM," a Mongol rider holding a smoking gun, and the text
"Respect Few, Fear None."  Pictures of LAVOY and his tattoos are
below:

 

c.    Law enforcement also seized multiple
Mongols-branded items from LAVOY's residence on March 6, 2025,
including photographs of LAVOY wearing a leather vest with
Mongols patches, a leather vest with a patch that read "Property
of Buckshot," a written copy of the Mongols constitution, due
sheets listing debts for other suspected Mongol members, hats

21

and a motorcycle helmet with the word "Mongols" written across, and a plaque honoring "Buckshot" as a "Lifetime Member" of the "Mongols M.C. Nevada," noting that he was a "Member Since 3-7-2007."

       d.   Based on my training and experience, I understand that many of these items -- and in particular the leather vest with Mongols patches that LAVOY was pictured wearing -- would only be possessed by a fully-patched member of the Mongols. Additionally, based on the above-described facts, I believe that LAVOY's moniker in the Mongols is "Buckshot."

    **D.   Defendants Confront and Attack Victim V.S., a Member of the Vagos, on March 4, 2025**

    28.  On the night of March 3, 2025, at approximately 8:30 p.m., LAVOY arrived at Firewater Bar ("Firewater"), a bar located at 1528 W. Holt Boulevard in Ontario, California with a female companion.  About an hour after LAVOY and his female companion arrived, LAVOY exited the bar and met PULIDO, who had arrived in a black sedan -- later identified as a black Dodge Dart registered to PULIDO -- in the parking lot.  PULIDO and LAVOY then entered Firewater together.

    29.  Firewater had, in the past, routinely attracted Mongols.  This had led to violence at the bar, which in turn caused the bar to ban customers from wearing vests reflecting membership in an outlaw motorcycle gang (<u>i.e.</u>, "cuts") inside the bar.

    30.  Notwithstanding the ban, PULIDO wore clothes that broadcasted his membership in the Mongols.  Specifically, PULIDO wore a black sweater with a large decal of the Mongols logo on

the back, and large white lettering on the front reading "MFFM" (an acronym for Mongols Forever Forever Mongols).  PULIDO also wore a black hat with "Mongols M.C." in white letters.

31.  A few hours later, at approximately 12:30 a.m., victim V.S. entered the bar.  V.S. was wearing clothing that reflected his membership in the Vagos, specifically a black sweatshirt with a black and green "Vagos MC SGV"[8] logo and a "Vagos MC" pendant on a gold-colored rope chain.[9]

32.  After V.S. entered the bar in his Vagos sweatshirt, PULIDO and LAVOY immediately began staring at V.S.  After some time, LAVOY spoke with V.S. and told him that he needed to say hello and show respect to rivals (i.e., the Mongols) when he showed up at a bar.

33.  PULIDO likewise told V.S. that V.S. needed to show respect.  PULIDO told V.S. that he respected V.S. because V.S. was PULIDO's elder, but that V.S. needed to show respect to PULIDO and LAVOY.

34.  The two rival factions continued to argue over V.S.'s perceived lack of respect during their time inside the bar.  At one point, V.S. told either PULIDO or LAVOY he was "being a little bitch."

35.  At a certain point, V.S. apologized and offered to buy a round of drinks for PULIDO and LAVOY.  PULIDO and LAVOY accepted the round of drinks, and the three individuals received

---

[8] Based on my training and experience, I understand that "SGV" is an acronym for San Gabriel Valley.

[9] Both were later recovered from V.S.'s body after he was shot and killed.

their drinks while continuing to stand next to each other at the bar.

36.  Some time after receiving drinks on V.S.'s tab, PULIDO asked the bartender to put another round of drinks on the victim's tab.  The bartender declined to do so.

37.  Around this time, LAVOY walked to the bathroom.  While in the bathroom, LAVOY directed at least one individual in that area to stay put.

38.  LAVOY then returned to PULIDO and V.S., who had remained next to each other at the bar.  LAVOY then said "go."

39.  Immediately after LAVOY said "go," PULIDO punched V.S. in the face.

40.  PULIDO and LAVOY then continued to attack V.S.  LAVOY was able to quickly overpower V.S., and began choking V.S. in a chokehold.  V.S. struggled against the chokehold, with blood rushing to V.S.'s face.

41.  The autopsy report reflects that V.S. had contusions to the top and bottom of his lips, a laceration on his left ear, an abrasion to the left side of his nose, and an abrasion on the left side of his chin.  V.S. also had a large, deep bruise on his neck consistent with being choked.

42.  Separately, V.S. had a wound behind his left ear, surrounded by bruising, consistent with being violently struck in the side of the head, potentially with a blunt object.

43.  When law enforcement arrested PULIDO, he possessed a metal ring smeared with blood,[10] with the Mongol motto "LMDM"

---

[10] Law enforcement is in the process of testing the blood found on PULIDO's ring.

(i.e., Live Mongol, Die Mongol).  Additionally, when law enforcement arrested and booked LAVOY, he had a one-inch abrasion to his right hand and a half-inch abrasion to his left hand.

44.    Based on my training and experience, as well as my knowledge of this investigation, I believe PULIDO and LAVOY inflicted all of the above-described injuries on V.S., each aiding and abetting the other during this two-on-one attack.

### E.    PULIDO Shoots V.S. Multiple Times in the Back as V.S. Tries to Flee PULIDO and LAVOY

45.    V.S. eventually freed himself from LAVOY's chokehold and began to run for the exit.  As V.S. was running for the door, PULIDO chased V.S. and pulled out a black gun.  PULIDO then fired multiple shots at the fleeing V.S.

46.    The victim's autopsy report reflects that PULIDO was shot multiple times in the back.  Specifically, the autopsy revealed four entry gunshot wounds in V.S.'s upper back area, one entry gunshot wound in V.S.'s lower back area, and multiple "through-and-through" gunshot wounds on V.S.'s side and stomach, from where bullets fired by PULIDO exited V.S.'s body.  The pathologist who conducted the autopsy collected four projectiles from within V.S.'s body.

47.    After PULIDO shot V.S. in the back, V.S. collapsed through the door of the bar and onto the sidewalk outside. PULIDO, LAVOY, and LAVOY's female companion then ran out of the bar, passing V.S.'s bleeding body on the sidewalk as they fled the scene.  PULIDO briefly returned to the body, yelled "Fuck! Fuck!," and ran away.

48.   OPD officers arrived on the scene shortly thereafter, followed by other first responders and emergency personnel. These first responders attempted to perform various life-saving maneuvers on V.S., but were not successful.  V.S. was pronounced dead on the scene at 2:45 a.m.

### F.   Law Enforcement Identify PULIDO and LAVOY, and Obtain Warrants for Their Arrests

49.   After the shooting, OPD officers obtained surveillance footage from a neighboring business that had several cameras facing Firewater.  A review of this footage showed, among other things, V.S. collapse as he was running out of the bar at approximately 2:16 a.m., and multiple muzzle flashes from the direction of an individual -- later identified as PULIDO -- who was chasing V.S. out of the bar.  The footage further revealed that the individual who shot V.S. was wearing a black hoodie with white lettering on it, consistent with the Mongol-branded items of clothing later recovered in PULIDO's car.

50.   A review of footage from a separate surveillance camera showed the individual in the black hoodie run towards a black Dodge Dart after the shooting, and that car then drive away from the bar.  An OPD officer who conducted a review of surveillance footage from the area around Firewater immediately after the shooting determined that a black Dodge Dart, bearing California license plate 7MNW389 (the "black Dodge"), had driven away from the area of the bar after the shooting.  OPD officers then determined that the black Dodge was registered to PULIDO. PULIDO, in turn, physically matched the man seen on surveillance

footage chasing V.S. out of the bar, and fleeing in the black
Dodge.

51. In the wake of these investigative steps, on March 4,
2025 law enforcement obtained a state arrest warrant for PULIDO
for murder, in violation of California Penal Code Section 187.
Law enforcement separately obtained a state arrest warrant for
LAVOY for being an accessory to murder in violation of
California Penal Code Section 32. OPD officers thereafter began
efforts to locate PULIDO and LAVOY, including by searching for
the black Dodge.

### G.  PULIDO Leads Law Enforcement on a High-Speed Chase Prior to His Arrest

52. After obtaining a warrant for PULIDO's arrest, OPD
officers determined that the black Dodge had recently hit on a
license plate reader on Mount Baldy Road, northeast of
Claremont, California. An OPD officer quickly responded to
Mount Baldy Road in an unmarked police car, located the black
Dodge, and identified the driver as PULIDO.

53. After locating PULIDO, law enforcement began following
PULIDO in the black Dodge, waiting for a safe opportunity to
take PULIDO into custody. However, PULIDO drove in a highly
erratic manner consistent with countersurveillance, including by
making abrupt stops (including on highways), increasing and
decreasing his speed without clear reason, and pulling into and
out of dead-end streets in residential neighborhoods, which
prevented police from safely stopping and arresting him. This
countersurveillance continued over the course of nine hours, as
PULIDO drove the black Dodge through five different counties.

54.   At approximately 6:15 p.m., PULIDO appeared to notice the law enforcement car that was trailing him.  Specifically, while driving on Interstate 5 in Kern County, near Lost Hills, PULIDO quickly increased his driving speed to over 110 miles per hour.  At this point, the trailing law enforcement car activated its emergency lights and siren in an attempt to stop PULIDO.

55.   PULIDO, however, did not stop.  Instead, he drove onto Highway 46, briefly decreasing his speed before increasing it to over 90 miles per hour.  As PULIDO continued to flee the pursuing police car, he drove through a solid red light -- nearly crashing into two other cars -- and then increased his speed to approximately 100 miles per hour.

56.   After about two minutes of this high-speed pursuit, PULIDO attempted an abrupt U-turn on the highway while traveling approximately 60 miles per hour.  However, in so doing, PULIDO lost control of his car:  the black Dodge skidded across multiple lanes of traffic at a high rate of speed before crashing into a ditch on the south side of Highway 46.

57.   After PULIDO's high-speed crash, law enforcement pulled alongside PULIDO and began ordering PULIDO to surrender.  Still, PULIDO failed to comply, and instead attempted to accelerate his car out of the ditch.

58.   As PULIDO continued his efforts to flee, more officers arrived at the scene of the crash.  With guns drawn, the officers continued to order that PULIDO surrender.  Unable to drive out of the ditch, PULIDO eventually exited his car with

his hands up.  PULIDO was then taken into custody on the state murder charge.

### H.    Defendants Are Both Convicted Felons

59.  Based on my review of conviction records, I know that PULIDO and LAVOY have been convicted of the following felony offenses:

a.    On or about June 6, 2023, PULIDO was convicted of Assault with a Firearm on a Person, in violation of California Penal Code Section 245(a)(2), in the Superior Court for the State of California, County of Los Angeles, Case No. KA13123001.[11]

b.    On or about October 27, 1992, LAVOY was convicted of Receiving Stolen Property, in violation of California Penal Code Section 496, in the Superior Court for the State of California, County of Marin, Case No. 36663.

### I.    LAVOY Resides at the SUBJECT PREMISES

60.  On March 6, 2025, OPD executed a search warrant at the SUBJECT PREMISES to search for LAVOY and evidence of the murder.[12]  Although LAVOY was not home at the time of the warrant,[13] officers found multiple items indicating that the SUBJECT PREMISES was LAVOY's primary residence, including court

---

[11] PULIDO was initially charged with attempted murder, in violation of California Penal Code Sections 187(a) and 664.

[12] LAVOY was arrested pursuant to a warrant for being an accessory to the murder.  LAVOY was booked into the San Bernardino County Jail but was released, and no charges were filed against him.

[13] Based on my review of law enforcement reports and conversations with other investigators involved in this investigation, I know that LAVOY was arrested at the home of another Mongols member.

documents addressed to "Clifford Michael Lavoy" at the SUBJECT PREMISES address, multiple Mongols paraphernalia branded with the moniker "Buckshot" (LAVOY's Mongol moniker), and multiple photographs of LAVOY wearing Mongols patches and posing with other Mongols.

61.  On April 8, 2025, I conducted surveillance at 10562 Oak Glen Avenue in Montclair, California.  At approximately 7:20 a.m., I observed LAVOY walk up to the property on foot, open the gate to the property, and proceed toward the back residence (i.e., the SUBJECT PREMISES).  At 8:35 a.m., I observed LAVOY walk out of the gate at 10562 Oak Glen Avenue, from the direction of the SUBJECT PREMISES, and enter a truck.

62.  On April 10, 2025, I again conducted surveillance at 10562 Oak Glen Avenue in Montclair, California and observed LAVOY walk from the direction of the back residence (i.e., the SUBJECT PREMISES) and out of the property's gate.  I then followed LAVOY as he walked to a neighborhood coffee shop.

## V.  TRAINING AND EXPERIENCE ON RACKETEERING OFFENSES

63.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct racketeering investigations, I am aware of the following:

a.  I know that gang members or members of associations-in-fact that engage in racketeering offenses like murder and assault often store or maintain items associated with their gang/association in their homes and on digital devices, such as a cellphone.  This can include photographs or images of

graffiti associated with their gang/association, photographs of
other objects displaying membership or allegiance to their
gang/association -- including posters, plaques, drawings, hats
or other apparel bearing gang signs and symbols,[14] rosters,
monikers, telephone numbers, and sometimes detailed notes about
discipline, debts owed, gang members who are not in good
standing, rent collection, and rent payments.  Such information
is frequently stored in digital format as well.

      b.   Correspondence between members of
gangs/associations discussing gang politics often occurs over
phone calls, e-mail, text message, and social media message to
and from smartphones, laptops, or other digital devices.

      c.   Gang/association members frequently keep mementos
of their gang/associations paraphernalia, including digital
photographs or recordings of themselves on their digital
devices, since they are a source of pride.  These photographs
and recordings are often shared via social media, text messages,
and over text messaging applications.

      d.   Additionally, I understand that evidence
regarding gang-related attacks such as the one on V.S --
including weapons or blood-stained clothes -- is commonly kept
in places controlled by the perpetrators of those attacks, such
as in their residences, in their vehicles, or on their persons.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

64.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I

---

[14] In the case of motorcycle gangs, these include, among
other things, leather jackets or "cuts," shirts, and helmets.

know that the following electronic evidence, among others, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

65.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

66.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult

to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

      b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

     67.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

      a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress a defendant's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of a defendant's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

//

//

## VII. <u>CONCLUSION</u>

68.  For all the reasons described above, I respectfully submit that there is probable cause to believe that PULIDO committed the crime of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1), that LAVOY committed the crime of aiding and abetting assault resulting in serious bodily injury in aid of racketeering in violation of 18 U.S.C. § 1959(a)(3) and 18 U.S.C. § 2(a), and that evidence, fruits, and instrumentalities of the Subject Offenses, as described in Attachment B, will be found in a search of the SUBJECT PREMISES, as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 11th day of
April, 2025.


_____
HON. SHASHI H. KEWALRAMANI
UNITED STATES MAGISTRATE JUDGE